[Crim. No. 1061.  In Bank.—April 30, 1904.]

## THE PEOPLE, Respondent, v. CHARLES LAWRENCE, Appellant.

CRIMINAL LAW — MURDER — CONSPIRACY TO ROB — SUFFICIENCY OF EVIDENCE—QUESTION FOR JURY.—In a prosecution for murder growing out of a conspiracy to rob, it is not necessary to support proof of such conspiracy to show that the parties met and actually agreed to undertake jointly to perpetrate the robbery, but it may be proved by facts and circumstances sufficient to satisfy the jury of its existence, and the weight and sufficiency of the evidence to prove such a conspiracy is a matter for the jury.

ID.—CONFLICTING EVIDENCE—PROVINCE OF JURY.—Where the evidence was conflicting, but there was sufficient evidence to support the finding of a conspiracy to rob and the defendant's participation in it, and that he precipitated the assault in which the life of the deceased was sacrificed, it was exclusively the province of the jury to determine in such conflict the credibility that ought to be given to the testimony, and to determine the weight and sufficiency of the evidence.

ID.—OBJECTION TO QUESTION—INADMISSIBILITY NOT APPARENT—NEGLECT TO STRIKE OUT ANSWER—ERROR WAIVED.—Where a question was objected to in answer to which admissible evidence might have been given, and the inadmissibility of the evidence was not apparent from the force of the question, the only remedy for inadmissible evidence given in answer to the question is to move to strike out the testimony; and where no such motion was made the error is waived, and none can be predicated upon the question.

ID.—RESPONSIBILITY OF CONSPIRATOR FOR MURDER BY CO-CONSPIRATORS.—Where there was a conspiracy to rob in which the defendant participated, in the perpetration of which a murder was committed by his associate, he is as guilty of murder as if he had actually done the killing himself, and it is no defense that the defendant did not intend that life should be taken in the perpetration of the robbery, or forbade his associate to kill, or regretted that it had been done.

APPEAL from a judgment of the Superior Court of Sacramento County.  E. C. Hart, Judge.

The facts are stated in the opinion of the court.

William F. Renfro, for Appellant.

U. S. Webb, Attorney-General, and C. N. Post, Assistant Attorney-General, for Respondent.

LORIGAN, J.—The appellant and Charles Padillo and Augustine Mirando were jointly informed against for the murder of one H. C. McCarty, near Elk Grove, Sacramento County.

The appellant was tried separately and convicted of murder in the first degree, the jury awarding the death penalty. He moved for a new trial, which was denied, and from the order denying such motion and from the judgment he appeals. The theory of the prosecution on the trial of the cause was, that McCarty was killed in resisting an effort on the part of defendant, and his co-defendants, to rob him, and one Mize, of certain personal property; that they had conspired together for that purpose, and that McCarty's death resulted from an effort on their part to effect such robbery.

There is certain uncontradicted evidence in the case which shows that the defendant and his co-defendants, Mirando (his half-brother) and Padillo, were, in the early days of September, 1902, engaged in hop-picking on the ranch of one Mahan near Elk Grove, Sacramento County. Among others similarly employed were the deceased, H. C. McCarty, and one Frederick Mize. The latter two camped together at the hop ranch, and on the afternoon of September 4, 1902, went, with a horse and cart belonging to McCarty, to the town of Elk Grove, some miles distant, to purchase provisions and a quantity of wine. After spending some time in Elk Grove, and having made their purchases of provisions and wine—the latter in bottles and a demijohn—they started for home. At about seven o'clock in the evening, when near the hop ranch where their camp was located, and at a point in the road lined on either side with heavy brush, they were met by Padillo and Mirando. These latter were on foot beside the road, were somewhat intoxicated, and, as McCarty and Mize drove up, approached the cart in a boisterous and aggressive manner, the former demanding a drink of wine. McCarty and Mize hesitated whether to stop, but, deeming it the more prudent course, did so, and a bottle of wine was handed to Padillo, from which both he and Mirando drank. While they were drinking, the defendant rode up on horseback and was also invited to drink. He got off his horse, approached the cart, and did so. At this juncture Padillo, addressing McCarty and Mize, said, ''You have got some more wine

there; we want all of it,'' to which demand Mize replied that this was asking too much and that they could not have it. Immediately on his refusal Mize was rendered unconscious by a blow on the head, and in his unconscious condition was kicked and beaten almost to death and left lying in the road. McCarty was also beaten, his scull fractured in a number of places by being repeatedly struck on the head, doubtless with the jagged edge of a broken bottle, from the effects of which he immediately died; and while he lay upon the ground dead a pistol-bullet was fired into his head by Padillo.

The only direct evidence in the case as to what occurred at the scene of the killing, subsequent to the time the defendant was asked to take a drink, is furnished by the testimony of the defendant himself. Neither Padillo nor Mirando were called as witnesses, and Mize, being rendered unconscious, could disclose nothing of the subsequent occurrences. The defendant testified, that when he first saw Padillo and Mirando, they were standing in the road opposite the cart in which McCarty and Mize were seated, drinking; that he rode towards them on his way to turn a horse he was riding out to pasture; that he was invited to take a drink, which he did; that he remained there for a considerable time, during which he took several drinks, and then rode away to the pasture, leaving the other parties together at the cart; that the pasture was about one hundred yards away, and having turned the horse loose in it, he stood watching him wander off; that he so remained about fifteen minutes, when he heard some loud talking and swearing from the locality where he had left the other parties; that he returned, and when he did so he saw McCarty and Mize lying on the ground some distance apart; that Padillo was bending over Mize, who was lying on the road, and was striking him with something he had in his hand (which the darkness did not permit him to distinguish), and Mirando was kicking him; that he called on them to desist, which Mirando did, but Padillo still continued striking; that defendant thereupon threw himself across Mize and hugged him as close as he could to prevent the infliction of any further injuries; that Padillo then walked over to where McCarty was lying and fired three shots at his body, the defendant meanwhile still clinging to Mize to protect

him; that after the shooting Padillo ordered him to come away from Mize, which he refused to do; that at the time the pistol shots were fired by Padillo at McCarty the horse which the latter and Mize had been driving ran down the road a short distance and stopped; that Padillo and Mirando started in the direction the horse had gone, whereupon defendant got up from Mize and followed them; that the three got in the cart and drove down to the hop-ranch camp, Padillo getting out at one point in the camp and Mirando at another, and the defendant driving on a little farther to what is known as the China house, where he unhitched the horse and turned him loose; that he took nothing from the cart; after unhitching he went back to where he had left Padillo and Mirando; that he did not say anything to any one that night about the fight, because he was afraid if he did so Padillo's friends would kill him; that Padillo and Mirando and McCarty and Mize appeared to be intoxicated, but that he was not.

It may be mentioned in this connection that Mize remained unconscious in the road where he had fallen until midnight; he then partially recovered consciousness, and in a half-dazed condition tried to reach his camp, got lost, remained in the brush all night, and at daylight found his way to the China house.

The body of McCarty was discovered next morning by a passer-by, lying in the road where the killing occurred.

In addition to the above undisputed evidence, and the evidence of defendant, there was other evidence produced on the part of the prosecution with a view of supporting the theory of a conspiracy, and the actual participation of the defendant in the killing of McCarty. It appears therefrom that on the morning of the day upon which at noon they quit work to go to Elk Grove, and possibly the day before, while McCarty and Mize were in the field picking hops, and in the presence of other hop-pickers (none of the defendants, however, being immediately present), they freely discussed their intention of going to Elk Grove to purchase wine. There was also the evidence of several witnesses that on the afternoon of the day of the homicide, about three o'clock, when McCarty and Mize were in Elk Grove, the defendant rode into that town, that he was in the postoffice when the mail was being gotten ready for distribution, that he seemed anxious

and in a hurry to get away, that, after staying there a few minutes, he left before the mail was distributed. It appeared also that the defendant and his co-defendants were together for some time at the cabin of the defendant Lawrence drinking, on the afternoon of the day of the homicide, and were close companions during the evening after the killing had occurred; that the pistol from which Padillo fired the shot into the body of McCarty belonged to the defendant Lawrence, and was loaned by him when they were together drinking at defendant's cabin in the afternoon; that on the afternoon of the day of the homicide Padillo stated that he and Mirando and the defendant Lawrence were going away to get some wine; that they had ten gallons coming, which they were going to take to the Piute Indian camp to sell to the Indians. In addition there was the testimony of a witness—Frank Blue—that he saw the defendant and his co-defendants, Padillo and Mirando, in the evening after the homicide, coming towards the China house and in McCarty's cart, and that when defendant stopped at the China house, he approached and helped him unhitch; that he asked the defendant what he had in the cart, to which he replied that he had some stuff belonging to the old man, and further stated that he (defendant) and Padillo and Mirando had "kicked hell out of a couple of fellows down the road"; that the three of them had done it; and that after kicking them they had gotten into the cart and come home; that he (defendant) had seen both McCarty and Mize in Elk Grove, and that they (defendants) had gone down to meet them and had taken the wine from them; he further directed the witness to get a drink out of the demijohn, which witness did, the demijohn being, as the witness stated, "hidden back of the China house, back of defendant's camp."

On the next morning defendant stated to the same witness that he thought he would get out of the trouble all right, as he had not shot the deceased, but that Padillo and Mirando had done the shooting.

The witness Mize, from whose testimony in the case the undisputed facts herein recited are principally gathered, further testified that neither he nor McCarty were intoxicated on the evening in question, and as to the relative situation of all the parties at the cart when he was rendered unconscious,

testified that Padillo and Mirando were to the right of the cart, where McCarty sat, and that defendant was upon the left side, where the witness was seated; that defendant was resting one hand on the wheel of the cart when witness handed him the bottle to take a drink; that it was then that Padillo made the demand for the wine, which was refused by the witness, which refusal was immediately followed by the blow on his head which rendered him unconscious.

The morning following the killing of McCarty the defendant made statements to several persons, which, while admitting his presence at the scene of the homicide, yet in some particulars were inconsistent with his testimony on the trial, as, for instance, in such statements he said that when he first saw McCarty and Mize in the road they asked him to take a drink, and that he then saw Padillo and Mirando out in the brush which lined the road; that he did not know who had the pistol which was fired during the killing, and that he did not know who had beaten Mize, as there were a dozen or more, whom he did not know, present at the time.

The defendant denied that he had gone to Elk Grove in the afternoon, or that he had made the statements attributed to him by the witness Blue.

This constitutes the main evidence in the case, and we set it forth because it is insisted by defendant on this appeal that it is insufficient to establish a conspiracy between the defendant and his co-defendants to rob the deceased and the prosecuting witness, Mize, or to show that defendant participated in the killing of McCarty either directly or indirectly.

It will appear, however, from a consideration of the evidence as we have recited it, that there was evidence produced by the prosecution upon both these matters, which, if believed by the jury, was sufficient to warrant them in finding the existence of both these facts.

It was not necessary to support proof of the conspiracy to show that the parties met and actually agreed to jointly undertake the perpetration of the robbery. From the secrecy with which unlawful undertakings of that character are adopted it would, in almost all instances, be impossible to make such proof, so that in prosecutions which involve proof of a conspiracy it may be proved by facts and circumstances sufficient to satisfy the jury of its existence, and the weight and suf-

ficiency of that evidence to prove such a conspiracy is a matter for the jury.

It is not necessary for us to particularly analyze or discuss the evidence submitted to the jury, in order to show that there was sufficient evidence to support this finding of the existence of a conspiracy to rob, and the defendant's participation in it, eventuating in the death of McCarty, because, if the jury believed the testimony of the witness Blue as to the declarations of the defendant made to him after the homicide, this with the other testimony in the case furnished sufficient evidence upon both matters to warrant the verdict. And it may be said in this connection that the jury would be justified in concluding that such declarations were true when they took into consideration, among other things, the close association of all these parties prior to and subsequent to the homicide; the defendant's visit to Elk Grove while McCarty and Mize were there, and his denial of the fact; the coincident meeting of all the defendants at the cart and their relative position beside it; the apparent knowledge of Padillo that McCarty and Mize were in possession of wine; the peremptory demand for it, together with the natural and reasonable inference, which the jury were warranted in drawing, that as defendant stood at the side of the cart upon which Mize sat, and was in possession of the bottle when the demand for the rest of the wine was made by Padillo and refused by Mize, that it was his hand that leveled the blow with the bottle on the back of Mize's head, rendering him insensible, and thus precipitating the assault in which McCarty's life was sacrificed.

While it is true that the evidence upon these points is conflicting, still there was sufficient evidence, if accepted by them, to warrant the jury in finding against the defendant on both these matters. It was exclusively the province of the jury to determine in such conflict the credibility that ought to be given to the testimony, and to determine the weight and sufficiency of the evidence, and having, by their verdict of guilty, necessarily found against the defendant, this court cannot under such circumstances interfere with the verdict.

The defendant complains of the refusal of the court to sustain his objection to a question put to one George Jameson, a witness called for the prosecution. This witness testified that he had a conversation with Mirando, one of the co-

defendants, on the night of the homicide, while the defendant Lawrence was close by. The conversation appears to have been had after the homicide. After testifying to the fact of such conversation, he was asked: "What was the conversation?" To this defendant objected on the ground that the question was irrelevant, immaterial, and incompetent, no part of the *res gestæ,* and could in no way bind the defendant. The objection was overruled, and the witness answered: "I asked Augustine (Mirando) did he know me, and he lit two or three matches to see my face, I suppose, and he said yes, he knowed me. And little Joe Blackwell was there with me, and he asked us to go down the road; he says: 'You come down the road,' and he says 'I will show you my dead soldier.' And I told him no—I thought he wanted us to go down the road and give us a drink." Counsel insists that the answer of the witness shows that this testimony was open to all the objections urged against it, and that the court erred in refusing to sustain his objection to the question under which it was elicited. No motion to strike out the testimony was made, counsel contenting himself with his objection.

Conceding that the testimony was inadmissible, its inadmissibility was not apparent upon the face of the question; it became apparent only when the answer was given. As far as the question is concerned, there was nothing perceptible from its terms which would indicate that any testimony given in response to it would be inadmissible. In fact, evidence given under it might well have been admissible. A conversation had with the co-defendant Mirando, in the presence and hearing of the defendant Lawrence, relative to the homicide, and in which conversation the latter participated, or remarks addressed to him, or responses given or withheld by him to declarations made by Mirando in his presence, charging him with active participation in the crime, would have all been admissible, or the question, and the answer thereto, might be merely preliminary to other questions and answers which, as a whole, would be admissible.

So it will be observed that whether any testimony would be admissible under the question asked could not be determined from a simple consideration of the question itself. It might or might not be, and this could not be perceived in advance of the answer. It could only be determined after the answer

was in. It was only then that the court could determine intelligently, or at all, the admissibility of the evidence, and whether it should be permitted to go to the jury or not. Under such circumstances, where it is not apparent from the question itself that the response thereto will, upon any theory of the case, be inadmissible, an objection alone to the question will be of no avail, but the party must, when the inadmissible evidence is for the first time disclosed by the answer, move to have it stricken out. This is the proper and only remedy, and the appellant here having failed to avail himself of such a motion is not in a position to predicate error merely upon a question which, upon its face, did not show that the testimony to be given in response to it would necessarily be inadmissible. (*People* v. *Williams,* 127 Cal. 216.)

Complaint is made of the following instruction to the jury: "Testimony has been adduced before you tending to show that the defendant Lawrence and others were engaged in a robbery of one Mize and the deceased McCarty at the Mahan ranch in Sacramento County; that while so engaged and in furtherance of the common purpose of Lawrence and his associates to accomplish this robbery, the deceased McCarty was slain by the defendant or by some of the parties with whom he was then engaged in the alleged robbery; I charge you, that it is no defense to a party associated with others in, and engaged in a robbery, that he did not propose or intend to take life in its perpetration, or that he forbade his associates to kill, or that he disapproved or regretted that any person was thus slain by his associates. If the homicide in question was committed by one of his associates engaged in the robbery, in furtherance of their common purpose to rob, he is as accountable as though his own hand had intentionally and actually given the fatal blow, and is guilty of murder in the first degree."

This instruction is a *verbatim* copy, with the exception of the names of the parties, from the instructions given in the Vasquez case, and appearing in the opinion in that case. (*People* v. *Vasquez,* 49 Cal. 562.)

The appellant does not question the correctness of the general principle of law contained in the instruction, but claims that the use of certain language in it constituted prejudicial error. His complaint is of the use of the words in the instruc-

tion, "that he did not propose or intend to take life in its perpetration," and the additional use of the word "regretted." We do not think the use of this language in the instruction, particularly when the whole instruction is considered, at all warrants the criticism directed against it by counsel, that thereby the court assumed the existence of a state of facts of which there was no evidence. We do not perceive that the court made any such assumption. In that portion of the instruction challenged by counsel the court was not referring to what the evidence tended to show. It was declaring an abstract principle of law to its fullest extent; that a party associated with others for the purpose of engaging in a robbery, in which a homicide is committed by one of his associates, is as guilty of murder as if he had actually done the killing himself, and it is no defense that the party did not intend that life should be taken in the perpetration of the robbery, or forbade his associates to kill, or regretted that it had been done. This was but the declaration of the rule of absolute responsibility of a party for a homicide committed by his associates in furtherance of their common purpose to rob, emphasized by a reference to possible defenses which might in such a case be urged, but unavailingly, against the responsibility, and we cannot perceive that the appellant has any reasonable ground to complain of it.

These are the only points relied on in appellant's brief, and we have accordingly discussed them at length. We have examined the other points made in the record to which our attention has been directed by counsel, but which he has not discussed in his brief. We do not perceive that they have any merit, and hence need no particular mention.

The judgment and order appealed from are affirmed.

McFarland, J., Shaw, J., Angellotti, J., Van Dyke, J., Henshaw, J., and Beatty, C. J., concurred.